**[Cite as *Wagner v. Community Regional Med. Ctr. of Ohio*, 194 Ohio App.3d 589, 2011-Ohio-2991.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

WAGNER,

    Appellant,

    v.

REGIONAL MEDICAL CENTER OF
OHIO et al.,

    Appellees.

Appellees
C.A. No.  10CA009815

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     09CV162956

DECISION AND JOURNAL ENTRY

Matthew G. Bruce, for appellant.

Thomas J. Wiencek, for appellees.

Dated: June 20, 2011

---

WHITMORE, Judge.

{¶1}   Plaintiff-appellant, Debra Wagner, appeals from the judgment of the Lorain County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Community Regional Medical Center ("Community Regional") and Allen Community Hospital ("Allen Community") (collectively, "defendants").  This court affirms.

I

{¶2}   Wagner worked at Allen Community as a critical-care agency nurse, a temporary position, for approximately ten months before she decided to apply for a full-time position with

Community Regional, Allen Community's owner. Wagner indicated on her employment application that she was not currently taking any medications. In fact, Wagner was taking prescription methadone as part of a treatment program for her chemical dependency. According to Wagner, she told several individuals at Allen Community about her drug addiction during the interview process, but did not disclose her methadone use on her application. Wagner also falsely completed the section of her employment application that inquired about any prior convictions. Specifically, she indicated that she did not have any prior convictions when, in fact, she did.

{¶3} Community Regional extended Wagner an offer of employment, and Wagner began working there as an intensive-care nurse on August 27, 2008. As a condition of her employment, Wagner completed a drug screen. Community Regional did not receive the results of the screen for a longer period of time than usual, a situation that generally arises when a screen returns a positive result, and a medical review officer has to verify any prescriptions. When Community Regional asked Wagner about the delay, Wagner disclosed that she was taking prescription medication. After her September 10, 2008 shift, Community Regional terminated Wagner because she had been untruthful on her employment application.

{¶4} On July 8, 2009, Wagner brought suit against defendants for wrongful termination, intentional infliction of emotional distress, and breach of confidentiality. On March 12, 2010, defendants filed a motion for summary judgment. Wagner filed a memorandum in opposition, and defendants filed a reply. On April 16, 2010, the trial court granted summary judgment in defendants' favor.

{¶5} Wagner now appeals from the trial court's judgment and raises one assignment of error for our review.

II

Assignment of Error

Summary judgment was improper in this case, as there remains a genuine
issue of material fact as to the reason for appellant's termination[.]

{¶6} In her sole assignment of error, Wagner argues that the trial court erred by granting summary judgment in favor of defendants. Specifically, she argues that a genuine issue of material fact remains as to whether she was wrongfully terminated due to disability discrimination. We disagree.

{¶7} This court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts of the case in the light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe-Woodward Co.* (1983), 13 Ohio App.3d 7, 12.

{¶8} Pursuant to Civ.R. 56(C), summary judgment is proper if "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-293. Specifically, the moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). Id. Once this burden is satisfied, the nonmoving party bears the burden of offering specific facts to show a genuine

issue for trial. Id. at 293. The nonmoving party may not rest upon the mere allegations and denials in the pleadings but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact. *Henkle v. Henkle* (1991), 75 Ohio App.3d 732, 735.

{¶9} This court previously has stated the following:

> One who claims employment discrimination on the basis of disability in violation of R.C. 4112.02(A) must show (1) that the plaintiff meets the definition of a disabled person under R.C. 4112.01(A)(13); (2) that the plaintiff can safely and substantially perform the essential functions of the job; and (3) that the discriminatory action was taken at least in part because of the plaintiff's disability. * * * When a prima facie showing of disability discrimination or retaliation is made, the burden shifts to the employer to show a nondiscriminatory reason for the action. If the employer makes this showing, the burden shifts back to the employee to show that the nondiscriminatory reason was a mere pretext.

(Citations omitted.) *Proctor v. Ohio Civ. Rights Comm.*, 9th Dist. No. 23198, 2006-Ohio-6007, at ¶ 9.

Here, the trial court granted summary judgment in defendants' favor because Wagner failed to establish a prima facie showing of disability. Specifically, it determined that Wagner did not show that defendants took "discriminatory action [against her] at least in part because of [her] disability." Id.

{¶10} Initially, we note that both parties relied upon non-Civ.R. 56(C) materials in their summary-judgment filings. See Civ.R. 56(C) (providing an exhaustive list of materials upon which a party may rely in moving for or opposing an award of summary judgment). Neither party objected to the introduction of this evidence. Accordingly, the trial court had the discretion to consider all the evidence that the parties submitted in their filings. *Wolford v. Sanchez*, 9th Dist. No. 05CA008674, 2005-Ohio-6992, at ¶ 20, quoting *Christe v. GMS Mgt. Co., Inc.* (1997), 124 Ohio App.3d 84, 90 ("[I]f the opposing party fails to object to improperly introduced

evidentiary materials, the trial court may, in its sound discretion, consider those materials in ruling on the summary judgment motion").

{¶11} In support of their motion for summary judgment, defendants primarily relied upon (1) Wagner's employment application, which included a medical history form and (2) Wagner's deposition. Wagner had checked the box marked "Yes" on the portion of the medical history form asking: "Have you ever been treated for alcoholism or a drug habit?" In the space asking her to list any medication she was currently taking, however, Wagner indicated that she was not taking any medications. Wagner signed the bottom of the form, which contained the following certification: "I certify that the above statements are true and correctly recorded[.]" Wagner admitted in her deposition that she did not truthfully complete the medical-history portion of her employment application.

{¶12} Wagner testified in her deposition that defendants told her that the reason for her termination was that she had falsified her medical history. Further, Wagner was unable to point to any facts to demonstrate that defendants had actually fired her based on her disability. The relevant portion of Wagner's deposition reads as follows:

> Q. * * * So what facts do you have to establish any part of the hospital's decision to terminate you was based on your alleged disability for chemical dependency?
>
> A. What else did they fire me for? They fired me over not disclosing to [Human Resources] the medication that I was on.
>
> Q. That's correct?
>
> A. Right.
>
> Q. But do you have any facts other than that to demonstrate your termination was due in part to your disability?
>
> A. No. All I have is being terminated for not disclosing my medication.

Q. Okay. And did anyone from the hospital specifically tell you you were being terminated because of your disability or methadone use?

A. No.

Q. So did anyone from the hospital say anything to you that led you to believe the hospital was firing you because of your disability or methadone use?

A. No. * * *

 * * *

Q. Do you have any facts to establish the hospital's reason for terminating you for falsification of your medical history was not the real reason for your termination?

A. No, that's what they said. They said I was terminated for not disclosing that medication.

Accordingly, Wagner admitted that she could not point to any evidence that defendants had terminated her for any reason other than the reason they gave: that she had falsified her medical history. The preemployment statement that Wagner signed as part of her application form also contained the following certification:

I certify that all information I have provided on this application * * * is true, accurate, and complete to the best of my knowledge and belief. I understand that falsification, misrepresentation, or omission of any information on my application * * * will be justification for withdrawing any offer of employment or, if employed, termination from employment, regardless of when the falsification, misrepresentation or omission is discovered[.]

Thus, Wagner was on notice that any falsification, misrepresentation, or omission on her part was a terminable offense.

{¶13} In her memorandum in opposition to summary judgment, Wagner relied upon her own affidavit and a series of e-mails between an employee health manager and the director of in-patient nursing at Allen Community. In the e-mail exchange dated September 5, 2008, the employee health manager wrote the following:

I discovered [Wagner's] drug screen was not back from 8-22-08 yet. I knew based on * * * my experience in post offer physicals that this indicated the drug screen was being medically reviewed (MRO), which also meant that she was taking a drug of some kind.

In MRO of a [drug screen] the reviewing physician determine[s] whether the drug found on the [drug screen] is legally prescribed or not. If it is then the drug screen is reported out as a negative. Which hers has been.

The issue with this individual is that on the medical history she filled out post offer in this office she indicated she was taking no medications and signed her name to the statement[:] "I certify that the above statements are true and correctly recorded[.]"

Now due to the MRO of the [drug screen] we know that she was on medication at the time of the physical. Therefore she falsified her medical history form.

The employee health manager further wrote: "It is [Human Resources'] recommendation that we proceed with termination based on the fact that she falsified the medical history."

{¶14} Wagner relies upon the e-mails from the employee health manager to argue that "[o]nce [Defendants] discovered that [she] was using methadone, [she] was terminated." The e-mails, however, do not support that assertion. Wagner's termination was not based on the type of prescription medication she was taking. Rather, it was based on Wagner's false, sworn statement that she was not taking *any* prescription medication. Wagner admitted that she had falsified the medical history portion of her employment application and that no one had authorized her to record the false response that she did. She testified in her deposition that she had evaded questions about her disability and criminal history on applications because "if [she] could get to just interview with somebody, [she] thought [she] could explain [herself] and maybe get hired."

{¶15} Based on the foregoing, we cannot conclude that the trial court erred by finding that defendants were entitled to summary judgment. Wagner failed to establish a prima facie

case of disability discrimination. See *Proctor*, 169 Ohio App.3d 527, 2006-Ohio-6007, at ¶ 9 (requiring plaintiff to establish that discriminatory action was taken at least in part because of the plaintiff's disability). See also *Aloi v. Ravenna Aluminum Indus.* (May 23, 1997), 11th Dist. No. 96-P-0205, at *3-5 (concluding that plaintiff failed to prove discrimination where employer had terminated plaintiff for falsifying a portion of his employment application). The record supports the conclusion that defendants terminated Wagner because she had falsified her medical history. Wagner's own exhibit indicates that defendants eventually received a negative drug-screen result for Wagner. Wagner fails to point to any evidence that defendants knew her prescription was for methadone, the link to her chemical-dependency disability. See R.C. 4112.01(A)(16)(a)(iii) (including drug addiction as a mental impairment for purposes of disability). Defendants terminated Wagner because she "was taking a drug of some kind," a fact that she falsified on her medical history form before signing a sworn statement that her answers were true. Wagner has not pointed to any evidence that she was terminated, at least in part, based on her disability. Even viewing the evidence in a light most favorable to Wagner, see *Temple*, 50 Ohio St.2d at 327, her argument that the trial court erred by awarding defendants summary judgment on her wrongful-termination claim lacks merit. Wagner's sole assignment of error is overruled.

### III

{¶16} Wagner's sole assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

MOORE, J., concurs.

BELFANCE, P. J., dissents.

BELFANCE P.J., dissenting.

{¶17} I respectfully dissent. Because I believe that there is a genuine issue of fact regarding whether the reason that Community Regional Medical Center ("CRMC") offered for Debra Wagner's discharge was a pretext for disability discrimination, the trial court erred by granting CRMC's motion for summary judgment.

{¶18} As an initial matter, it appears that although CRMC argued, in part, that Wagner did not demonstrate an issue of fact with respect to whether its decision was a pretext for discrimination, the trial court analyzed this case solely under a "direct evidence" framework. The ultimate issue in cases alleging employment discrimination under R.C. Chapter 4112 is whether the adverse employment action was motivated, at least in part, by discriminatory intent. See *Columbus Civ. Serv. Comm. v. McGlone* (1998), 82 Ohio St.3d 569, 571. See also *Cooke v. SGS Tool Co.* (Apr. 26, 2000), 9th Dist. No. 19675, at *2-3 (emphasizing that the ultimate question under R.C. 4112.02 is whether the employment action was "because of" membership in a protected class). While an employee can prove discrimination by using direct evidence, it can also be proved indirectly. See generally *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256; *Mauzy v. Kelly Servs. Inc.* (1996), 75 Ohio St.3d 578, 583. In *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, the United States Supreme Court described the indirect method of proving discrimination under Title VII of the Civil Rights Act of 1964. The court later summarized its holding in general terms applicable to other forms of discrimination:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to

prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

(Citation omitted.) *Burdine*, 450 U.S. at 252-253, quoting *McDonnell Douglas Corp.*, 411 U.S. at 802. Given the varying forms of discrimination, the articulation of the prima facie elements under the *McDonnell Douglas* paradigm varies. See, e.g., *O'Connor v. Consol. Coin Caterers Corp.* (1996), 517 U.S. 308, 311-312, quoting *Burdine,* 450 U.S. at 254 ("[T]here must be at least a logical connection between each element of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption' "). The *McDonnell Douglas* paradigm for analyzing discrimination claims has since been applied to cases in which disability discrimination is alleged. *Raytheon Co. v. Hernandez* (2003), 540 U.S. 44. Federal caselaw may be employed in interpreting R.C. Chapter 4112 to the extent that the employment-discrimination statutes at issue are consistent. *Genaro v. Cent. Transport*, *Inc.* (1999), 84 Ohio St.3d 293, 297-298.

{¶19} The Ohio Supreme Court has not specifically articulated the *McDonnell Douglas* prima facie case in the context of disability discrimination. In *Hood v. Diamond Prods., Inc.* (1996), 74 Ohio St.3d 298, 301-302, for example, the Ohio Supreme Court referred to the *McDonnell Douglas* framework with respect to disability discrimination under R.C. 4112.02, but did so in a limited context that did not entail an inquiry into indirect evidence of discriminatory animus. In fact, the issue before the court in *Hood* was a narrow one: whether cancer could be considered a "handicap" for purposes of R.C. 4112.02, and if so, what quality of proof would be necessary to establish it. See id. at 302 ("The case we now have before us concerns only whether appellant was 'handicapped' – the first element of a prima facie case of handicap

discrimination"). Consequently, although the Supreme Court implicitly acknowledged that *McDonnell Douglas* could be used by Ohio courts, the issue of how the prima facie case should be articulated was not squarely before the court.

{¶20} In that context, the court noted that part of a plaintiff's initial burden under cases applying *McDonnell Douglas* is demonstrating that the employer's action was motivated, at least in part, by disability. See *Hood,* 74 Ohio St.3d at 302, citing *Hazlett v. Martin Chevrolet, Inc.* (1986), 25 Ohio St.3d 279, 281. In *Hazlett*, however, the court did not address *McDonnell Douglas* and did not articulate any test for indirectly proving discriminatory animus. Instead, the issue before the court was whether an individual who was chemically dependent qualified as disabled under R.C. 4112.02. *Hazlett*, 25 Ohio St.3d at 279-280. In considering the issue, the court emphasized that a chemically dependent individual must be able to perform the essential functions of the job. See id. at 281. The court then articulated the prima facie case required to establish ultimate proof of a claim under the statute: the plaintiff must prove that he or she was handicapped; that the plaintiff could "safely and substantially perform the essential function[s] of the job[;]" and that the employer acted, at least in part, because the plaintiff was disabled. Id.

{¶21} If the plaintiff's initial burden of production under the *McDonnell Douglas* paradigm is articulated in this way, however, it is coextensive with proof of the claim itself. In other words, it "more aptly describes what is required to win a judgment, not to make out a *prima facie* case under the *McDonnell Douglas* framework." *Whitfield v. Tennessee* (C.A.6, 2011), 639 F.3d 253, 261, fn. 3. See also id. at 262-265 (Stranch, J., concurring) (commenting on the use of an analogous formulation of the prima facie case under the Rehabilitation Act of

1973 in the *McDonnell Douglas* framework).[1]  Indeed, to apply the *Hazlett* and *Hood* formulation of the prima facie case "makes little sense, as its third element—whether the employee was, in fact, discharged because of the disability—requires at the prima facie stage what the *McDonnell Douglas* burden-shifting framework seeks to uncover only through two additional burden shifts, thereby rendering that framework wholly unnecessary."  See *Whitfield,* 639 F.3d at 259.

**{¶22}**  This district and other appellate districts have relied on *Hood* in determining how the prima facie case under the *McDonnell Douglas* framework should be articulated.  See, e.g., *Proctor v. Ohio Civ. Rights. Comm.*, 169 Ohio App.3d 527, 2006-Ohio-6007, at ¶ 9; *Tibbs v. Ernst Ents, Inc.*, 2d Dist. No. 22850, 2009-Ohio-3042, at ¶ 22; *Foster v. Jackson Cty. Broadcasting, Inc.*, 4th Dist. No. 07CA4, 2008-Ohio-70, at ¶ 14; *Sicklesmith v. Chester Hoist*, 169 Ohio App.3d 470, 2006-Ohio-6137, at ¶ 97.  Because application of *McDonnell Douglas* under Ohio law was not considered by the Supreme Court in *Hazlett* and was not squarely before the court in *Hood*, however, it is appropriate to look to how other courts have articulated the prima facie case.  I believe the better articulation of the prima facie case under *McDonnell Douglas* in the context of disability discrimination is that described in *Monette v. Electronic Data Sys. Corp.* (1996), 90 F.3d 1173, 1186:

> [T]he plaintiff may establish a *prima facie* case of discrimination by showing that: 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability;

---

[1] Unlike Ohio courts, the United States Sixth Circuit Court of Appeals has required plaintiffs to prove that disability discrimination was the only motivation for the employment action at issue. See generally *Monette v. Electronic Data Sys. Corp.* (C.A.6, 1996), 90 F.3d 1173, 1178.  The Sixth Circuit recently took this issue under consideration en banc in *Lewis v. Humboldt Acquisition Corp., Inc.*, Case No. 09-6381.  The Sixth Circuit's articulation of the prima facie case for purposes of *McDonnell Douglas* is not affected by this discrepancy.

and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

See also *Whitfield,* 639 F.3d at 259 ("*Monette* states the proper test").

**{¶23}** This is not just a theoretical distinction: the substantive elements of a plaintiff's claim frame our analysis under Civ.R. 56. "A disputed fact is material if it is an essential element of the claim as determined by the applicable substantive law – one which might affect the outcome of the litigation." *Wochna v. Mancino*, 9th Dist. No. 07CA0059-M, 2008-Ohio-996, at ¶ 9, citing *Anderson v. Liberty Lobby, Inc*. (1986), 477 U.S. 242, 248. This case illustrates the problem. Instead of analyzing Wagner's disability-discrimination claim through the *McDonnell Douglas* framework, the trial court entered judgment for CRMC based on its conclusion that Wagner had not established a prima facie case under *Hazlett* – in effect, requiring Wagner to prove the ultimate issue in the case through direct evidence of discrimination or not at all. As explained above, however, it is well established that discriminatory intent may be established either by direct evidence or indirectly, using the *McDonnell Douglas* framework. *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125, 128.

**{¶24}** Analyzing this case under the *McDonnell Douglas* framework leads to a different result. It appears that the parties would not dispute that Wagner has established the prima facie case articulated in *Monette*: she is recovering from chemical dependency, demonstrated her qualification for the position by performing the same job duties through a staffing agency, and was terminated after being hired directly by CRMC, and CRMC had reason to know of her disability by virtue of her conversations with supervisory employees and her disclosure of her methadone use to the testing entity operated by CRMC. In its motion for summary judgment, CRMC articulated a legitimate, nondiscriminatory reason for terminating Wagner's employment: dishonest statements in connection with her application for employment. It did so with reference

to evidence that is contemplated by Civ.R. 56(C), namely, Wagner's own deposition testimony. Consequently, CRMC met both its evidentiary burden under Civ.R. 56(C) and its substantive burden of production under *McDonnell Douglas.* See generally *St. Mary's Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 506-511, quoting *Burdine*, 450 U.S. at 254 (describing the defendant's burden under *McDonnell Douglas* to "produc[e] an explanation to rebut the prima facie case" but noting that the defendant does not have the burden of proving " 'that it was actually motivated by the proffered reasons' "). At this point in the analysis under *McDonnell Douglas*, the burden of production shifts to Wagner to point to evidence indicating that the nondiscriminatory reason articulated by CRMC is a pretext for disability discrimination. When the evidence before the court with respect to the motion for summary judgment is viewed in the light most favorable to Wagner, as it must be, there is at least a genuine issue of material fact on this point.

{¶25} Wagner originally began working as a nurse at Allen Community Hospital ("ACH") through an agency. For approximately ten months before she was directly hired, Wagner worked in the ACH intensive-care unit caring for critical-care patients. One of her supervisors, Suzanne Green, asked Wagner why she didn't apply to be directly hired for the position, noting that Wagner needed the benefits. Wagner explained to Green that she "ha[d] a past" and that she was in recovery. Green stated that she would run it by Eileen Boozer, the nursing supervisor. Wagner made a similar disclosure to Dorrie Adams, another supervisor.

{¶26} Green told Wagner that Eileen Boozer had said to come in and fill out an application. Wagner then spoke to Boozer, telling her that she was in recovery and still involved in a treatment program. She also told Boozer that she was still seeing a counselor and doing monitored drug screens. Boozer stated that she would speak to Community Health Partners and her boss, Brian Yorko.

{¶27} Wagner interviewed for a position with Yorko. When Yorko initially asked Wagner to tell him a few things about herself, Wagner said, "[W]e might as well address the elephant in the room first. I have a drug addiction problem that I have been treated for, am being treated for." During the interview, Wagner told Yorko that she had been working at ACH for a long time and she that wanted to go on staff, but she was afraid to try for the job because she knew her history and chemical dependency would have to be revealed. She was also afraid that if ACH didn't want to hire her, she would be prohibited from working at ACH through an agency. She also disclosed her criminal history to Yorko during her employment interview.

{¶28} CRMC operates ACH. CRMC Human Resources ("HR") Department called Wagner to offer her the position, and Yorko sent Wagner a letter of employment. After being hired, Wagner was required to take a drug test. She filled out a medical-history form and did not indicate that she was taking any medication because she had been told that she was not required to publicly disclose her methadone prescription. When she went to Occupational Health, a division of CRMC, she took her methadone prescription with her and disclosed it to the doctor and the nurse that performed the drug screen. She told them, "I'm not trying to get over on anybody. I'm not trying to be dishonest. It's a medication I don't have to disclose to everybody."

{¶29} Wagner stated that she had been told by her treatment facility that she did not have to disclose to HR what medication she was taking; rather, her understanding was that she was required to disclose it to Occupational Health, the testing entity. Although she offered the prescription at the point of testing, Wagner stated that they did not take the prescription. Instead, she was told that the "medical review officer [MRO] will get a hold of [her] when they get [her] urine and [she'll] verify the prescription with the MRO."

{¶30} After the test, and approximately three to four days prior to Wagner's termination, Eileen Boozer called Wagner to her office. Boozer told Wagner that she got off the phone with HR and that HR was waiting for the paperwork to come back from Occupational Health so that it could close up her file. Boozer asked Wagner whether she knew why Occupational Health had not reported back on the screen. Wagner indicated that Boozer had told her, "HR said that you wrote down that you weren't on a medication, and your drug screen is being held up because it hasn't been---medication hasn't been verified, your prescription hasn't been verified yet. HR said that, you know, you said you're not on medicine and you are on medicine, what is the deal with that."

{¶31} Wagner told Boozer that she had taken her prescription with her to the drug screen and disclosed it to the nurse and doctor there, but that she had been told that the MRO would contact her to verify the prescription. She also explained that she had signed a consent form for her treatment facility to verify the prescription. She explained to Boozer that she did not list the medication on the medical history form because she believed it was a medication she was not required to list. She further told Boozer, "It was disclosed to the people it had to be disclosed to, and that was the physician and his staff and occupational health; the nurse that took my drug screen and the MRO."

{¶32} E-mail correspondence dated September 4, 2008, indicates that the test results were known to HR and that the results were negative because the prescription had been verified by the MRO. On this day, Marsha Heuring, employee health manager, e-mailed Jennifer Angle, the manager of employment. In the e-mail, Heuring indicated that Wagner had called HR asking why a doctor wanted to talk to her. Heuring stated that she saw that the drug screen was not

back, that the delay meant the test was being medically reviewed, and that medical review meant that Wagner was taking a drug of some kind.

{¶33} Heuring indicated that the screen had come back negative. Heuring had stated, "Now due to the [medical review] of the [drug screen] we know she was on medication at the time of the physical. Therefore she falsified her medical history form." Several days later, on September 9, 2008, Angle e-mailed Boozer at 1:10 p.m. In that e-mail, Angle stated:

> It is HR's recommendation that we proceed with termination based on the fact that she falsified the medical history. Additionally, there has been a pattern of dishonesty and concerns with rude behaviors when she has contacted occupational health. If we are all in agreement, HR will proceed with the termination. Please advise.

Yorko and Heuring were copied on this e-mail. At 1:52 p.m., Boozer responded to Angle. She stated:

> Sorry I sent the other email before I saw this. Deb tells me she told occupational health and offered the prescription at the time of the drug screen, which they stated wasn't needed, are we sure she didn't do this? The conversation with HR over the application, occurred after these 2 incidents, correct?

Wagner was terminated by HR. She had a conversation with a person whom she could not identify by name. As she was speaking to this person, Wagner understood that the person was aware that she was taking methadone. At her deposition, she stated that the person who terminated her said, "[T]he [nursing] board knows you take it, right?" Wagner stated that because the HR person made reference to the nursing board's being aware of her taking this medication, she knew that HR was aware that it was methadone. She explained that although the HR person "didn't come right out and say, you know, the drug name, but it was a treatment drug, she knew it, I knew it, and for her to say that the board knows you're on it, then what is the problem, I know it had to do with the medication I was on."

{¶34} The trial court and the majority opinion take the position that Wagner's deposition testimony is tantamount to an admission that she loses. Specifically, they point to Wagner's repeated statements that she was told she was being terminated for lying on her application. I do not find this persuasive for several reasons. First and foremost, as argued above, the lack of direct evidence of discrimination does not end this court's inquiry. At most, Wagner stated that she did not have direct evidence of discriminatory animus, a fact that is unremarkable in many cases of discrimination. In addition, Wagner's statement as to why her employer terminated her merely articulates what her employer told her. It does not mean that what her employer told her is true. The effect of articulating a legitimate nondiscriminatory reason is not judgment for the employer. It merely ends the presumptive effect of the plaintiff's prima facie case. See *St. Mary's Honor Ctr.*, 509 U.S. at 506-511. Pretext is a material issue for purposes of summary judgment, and to the extent that CRMC points to her statements to demonstrate that there is no genuine issue of material fact regarding pretext, I must disagree. Viewing Wagner's statements in the light most favorable to her, it is apparent that their use in this manner divorces them from their context within her deposition testimony. It is clear that in response to the repeated question about whether she had evidence about why she was terminated that she responded with the reason that she was given by her employer. It is also clear that she did not believe it.

{¶35} In light of this, I believe that viewing the evidence in the light most favorable to Wagner leads to the conclusion that there is a genuine issue of material fact with respect to whether CRMC's articulated reason for firing her is pretext because it demonstrates that she was open and honest about her recovery from chemical dependency and disclosed her medication at her post-hire drug test. Further, there is no indication that those managers to whom she initially disclosed her chemical dependency provided this information to the human resources staff. In

other words, there is no evidence that at the time Wagner was hired, HR knew about her chemical dependency. Thus, even if CRMC decided to terminate Wagner in part due to her failure to disclose her medication on the form or to properly fill out her employment application, there is a dispute of fact as to whether CRMC nonetheless terminated Wagner in part due to her chemical dependency. Again viewing the evidence in the light most favorable to Wagner, the proximity of HR's discovery of this fact to her termination under circumstances where she was open and truthful about her methadone use to her superiors and at the time of the drug test indicates that there is an issue of material fact regarding whether it was a motivating factor in her termination.

{¶36} Wagner met her evidentiary burden under Civ.R. 56 of demonstrating that there is a genuine issue of material fact regarding whether the nondiscriminatory reason proffered for her discharge was pretext. The trial court, therefore, erred by entering summary judgment in favor of CRMC, and I would reverse on that basis.

{¶37} I respectfully dissent.